## ROTAPRINT MACHINES, INC. v. UNITED STATES

**No. 5669.**—Invoices dated Berlin, Germany, July 8, 1939, etc. Entered at New York, N. Y., August 1, 1939, etc. Entry No. 37418, etc.

(Decided June 25, 1942)

*Daniel P. McDonald* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

DALLINGER, Judge: These appeals to reappraisement involve the question of the dutiable value of certain so-called rotaprint machines imported from Germany and entered at the port of New York in April and August 1939. The machines covered by reappraisement appeal 139611–A were described in the invoice as "Two office offset printing and duplicating machines Rotaprint model R–30 without motors and small rollers," and were entered at 3,900 reichsmarks each less 247.50 reichsmarks for composition on two machines, plus packing. The said machines were appraised at 6,978.50 reichsmarks each, plus packing.

The machines covered by reappraisement appeal 139612–A were described on the invoice as "Two Rotaprint office offset printing and duplicating machines model Rkl, with automatic inking and dampening device," and were invoiced and entered at 1,021.25 reichsmarks each, plus packing. They were appraised at 2,040 reichsmarks each, plus packing.

The machines covered by reappraisement appeal 139613–A were described in the invoice as "Two office offset printing and duplicating machines Rotaprint model R–30 without motors," and were invoiced and entered at 3,900 reichsmarks each, plus packing. They were appraised at 7,226 reichsmarks each, plus packing.

All of said machines were appraised on the basis of foreign value. It is claimed that the proper basis for determining dutiable value is the export value, as entered.

At the hearing, held at New York on December 16, 1941, the plaintiff offered in evidence the testimony of Edgar Floer, president and general manager of the plaintiff-corporation, who testified that he was

a citizen of the United States; that his corporation was engaged in the importation of office equipment and supplies from abroad; that in 1939 it imported the machines at bar under a contract with the German manufacturer, dated May 12, 1939, a photostatic copy of which was admitted in evidence as plaintiff's exhibit 1, and the first part of which reads as follows:

We, Rotaprint Akt.-Ges., Berlin, Germany, herewith confer to you the exclusive right to sell and deal in Rotaprint office offset printing and duplicating machines together with all parts, accessories, materials and supplies for these machines in the following territory:

New York, New Jersey, Pennsylvania, Connecticut, Massachusetts, Rhode Island, Maine, Vermont, New Hampshire.

The witness then proceeded to testify in part as follows:

Q. Did you have any agreement with the manufacturer whereby the manufacturer was forbidden to sell freely its machines to persons in other states than those enumerated in this contract?—A. No.

\* \* \* \* \* \* \*

Q. Will you state how you knew the manufacturer was carrying on business during this period with persons other than yourself in the United States?—A. May I explain that a little in detail as to how I know?

Q. Yes.—A. Prior to our own importations, we were purchasing these same equipments and supplies from another organization in another state not mentioned in this contract, and at the termination of their contract with the manufacturer we obtained our contract, and, simultaneously, he signed a contract of the same wording but applying to other states; and he continued doing business at the same time we did, and we used the same forwarding agent and customhouse broker, and I do know entries were made, to the best of my knowledge, during those few months.

\* \* \* \* \* \* \*

Q. And did you have occasion to do business with that other concern during that period?—A. Yes, sir.

Q. Did you sell them machines at times when they were short?—A. Yes, sir.

Q. And did you buy machines from them?—A. Yes, sir.

Q. What is the name of the concern, and where are they located?—A. American Rotaprint Corporation, 1909 Euclid Avenue, Cleveland, Ohio.

\* \* \* \* \* \* \*

Q. Now, during the life of this written contract, Exhibit 1, state what was the relationship existing between your concern and the manufacturer.—A. They were the seller and we were the buyer.

Q. And the machines were all purchased outright by your concern?—A. Yes, sir.

Q. Not consigned to your concern, were they?—A. No.

Q. Now, will you state what models of machines were covered by these importations. You have the papers before you to refresh your memory.—A. Model Rkl. and Model R–30.

Q. Were these the only machines you imported?—A. The only two types which we imported.

Q. Now, will you state \* \* \* what your purchase price was for these two machines?—A. The Rkl. machine was purchased by us from the manu-

facturer at Rm. 1,021.25 each, f. o. b. factory, without packing. The price of the R–30 machine under the same conditions is Rm. 3,900, even.

* * * * * * *

Q. Have you another invoice from which you might obtain the packing charges?—A. The packing charges for the R–30 machines are Rm. 98 for each.

Q. That was the R–30?—A. Plus Rm. 4.25, making a total of Rm. 102.25 for each R–30 machine.

Q. Have you got anything on the Rkl. for packing?

* * * * * * *

A. * * * the packing charge for each machine would be Rm. 30.80.

Q. Mr. Floer, were these machines complete when they were imported by you?—A. No.

Q. Wherein were they incomplete?—A. They are not equipped with an electric motor, which is necessary for their operation, and they are furthermore not assembled for use completely.

Q. What about the ink roller, ink attachments? Were they attached to the machines or imported with the machines?—A. Not always.

Q. In cases where they were not imported with the machines, state what you did to procure such inking devices, if you did procure them.—A. At times these machines arrived without the composition on the ink rollers, which is a rubber product, and made by the rubber manufacturer mostly in Dayton, Ohio, to whom we sent the bare steel shafts so they could weld on the mass of composition and then grind the rollers down to the proper size so they would insure operation of the machine as it was supposed to operate.

Q. Then, after receiving the motors and rolls, state what you did to put the machine in complete condition for operation.—A. The motor, which we purchased from a domestic manufacturer had to be built into the machine and connected, the proper wiring made, and then the parts of the machine that were not assembled had to be affixed to the machine.

Q. After the machines were completely set up and put into operation, what did you do with these machines? Did you sell them?—A. We sold them, yes.

Q. To customers in the United States?—A. Yes, sir.

Q. Have you got a list of the persons to whom you sold these machines and the dates on which you sold them?—A. Yes, sir.

* * * * * * *

On June 14, 1939, R–30 machine, Serial No. 8360, sold to Benjamin Osher, 239 East 44th Street, New York City, Sales Ticket No. 1921, selling price $3,950.00.

After giving the names of other customers in the United States to whom the witness sold such machines, he continued to testify in part as follows:

Q. Now, in making sales of these machines, did you agree with the purchasers to train operators and keep these machines serviced for any length of time?—A. Yes, sir.

* * * * * * *

Q. And do you keep the machines in order and in good service for any length of time?—A. Yes, sir.

Q. And that is included in the purchase price?—A. Yes, sir.

On cross-examination the witness testified in part as follows:

X Q. Now, Mr. Floer, were you served with a subpoena out of this court to produce, in addition to this agreement, your commercial invoices from the foreign

manufacturer, and your office copies of invoices of all sales of such machines in this country during 1939?—A. Yes.

X Q. Will you produce them, please? Just take the first commercial invoices from the foreign manufacturer to yourself covering Rkl. and R–30 machines purchased and imported by you during 1939.

Mr. McDonald. If your Honor please, if this is going to the credibility of the witness it is proper; if it is going to build up some theory of valuation other than foreign or export value, it is improper at this time.

Mrs. Bennett. The Government, in order to save the time of the witness, has been operating in this fashion before Judge Dallinger. For this purpose, the Government is willing to make the witness a Government witness.

Mr. McDonald. That is quite agreeable.

Judge Kincheloe. Let the record show that. Read the question.

### Direct examination by Mrs. Bennett.

Q. [Read by Reporter] "Will you produce them, please? Just take the first commercial invoices from the foreign manufacturer to yourself covering Rkl. and R–30 machines purchased and imported by you during 1939."—A. Here is an invoice covering Rkl. machines 8753 and 8754; here is an invoice covering R–30 machines 8360 and 8369; here is an invoice covering R–30 machines 8925 and 8926, together with a subsequent credit memorandum because the machines had no ink holder composition on the shafts. That is all.

Q. Are these all the commercial invoices you have received from the manufacturer during the year 1939?—A. For machines, yes.

The witness was then asked to produce his invoices covering sales of such machines in the United States during 1939, which he did, the same being marked in evidence defendant's collective exhibit 3.

The witness then continued his testimony as defendant's witness in part as follows:

Q. When you offered these for sale in this country, you offered them as completely installed machines?—A. Yes.

  *   *   *   *   *   *   *

Q. In this Collective Exhibit No. 3, the only two sales that seem to have been made in 1939 were invoiced on June 14 and June 20, 1939 * * *?—A. Yes.

  *   *   *   *   *   *   *

Q. Both were from this importation, Reappraisement No. 139613–A?—A. Yes.

Q. And those were the first sales you made in this country in 1939, those two machines?—A. Yes.

At this juncture, counsel for the Government ceased her direct examination of the witness as her own witness and resumed her cross-examination, which was in part as follows:

X Q. You had no arrangement with the foreign manufacturer that payment was not due until you had sold it in this country?—A. No, we had no arrangement.

  *   *   *   *   *   *   *

X Q. Now, when you made your offers in this country, who fixed the price at which they were sold?—A. We did.

On redirect examination the witness testified in part as follows:

R. Q. Now, you testified in your direct examination that these machines were imported by you incomplete, in some cases without motors, and in some cases

without motors and ink rollers. Did you ever sell these machines exactly in the same condition as imported?—A. No.

\* \* \* \* \* \* \*

R. Q. And the prices which you gave to Government counsel were your selling prices to the customer?—A. Yes, sir.

R. Q. And that included the cost of the machine imported from Germany?—A. Yes, sir.

R. Q. Plus the motor?—A. Yes, sir.

R. Q. Plus the American inking device?—A. Yes, sir.

R. Q. Plus service to the customer?—A. Yes, sir.

R. Q. Plus training of the operator?—A. Yes, sir.

On recross-examination the witness testified in part as follows:

R. X Q. When you were asked to produce invoices, all invoices of such imported machines, were there any other invoices that might well have been included in Collective Exhibit 3?—A. Well, here is a complete folder. I will be only too glad to let you have it.

\* \* \* \* \* \* \*

R. X Q. \* \* \*. In building up your selling price, your total price, for your own office records, installed, did you include the actual cost of the motor yourself to the American manufacturer, or did you have a selling price which you included in that?

Mr. McDONALD. I object. It is immaterial what he included.

Mrs. BENNETT. This is the gist of the case.

Judge KINCHELOE. It is not part of the importation.

\* \* \* \* \* \* \*

Judge KINCHELOE. You asked about what the motor cost and what he sold it for. That is immaterial; it has nothing to do with it. Sustained.

Mrs. BENNETT. Exception. May the record show that the grounds upon which the Government is asking this question is to lay a foundation for the U. S. value of the imported merchandise.

Judge KINCHELOE. When your appraiser appraised it on foreign value? So you don't agree with the appraiser, do you?

\* \* \* \* \* \* \*

Mrs. BENNETT. Yes, I do.

At this juncture the plaintiff offered in evidence an affidavit executed by Theo. Harbeck, director of the foreign sales department of the German manufacturer, which was admitted in evidence as plaintiff's exhibit 4. In this affidavit the affiant testifies that no similar office machines doing substantially the same kind of work are manufactured or sold in Germany; that all sales for home consumption are made with the restriction that said machines must not be exported out of Germany; that the manufacturer fixes a minimum price above which dealers may not sell to consumers, a penalty being imposed for any violation of such restriction; that the machine known as R–30 has been sold since January 1, 1938, in Germany direct to consumers for use in Germany equipped with electric motor, four extra rollers and parts, for 7,800 reichsmarks; that the machine known as Rkl. has been so sold equipped with electric motor for 1,950 reichsmarks; that neither of said machines has been sold in Germany for home con-

sumption without electric motors; that the machine R–30 is sold to dealers in Germany for resale to consumers for use in Germany equipped with electric motors, extra rollers, and parts for 7,800 reichsmarks, less a discount up to 30 per centum; that the machine Rkl. is sold to dealers in Germany for resale to consumers for use in Germany equipped with electric motor and parts for 1,950 reichsmarks, less a discount up to 38⅓ per centum; that no person, firm, or corporation in the United States since March 20, 1939, has had an exclusive sales agreement for the whole of the United States; that since March 20, 1939, the R–30 machine had been freely offered and sold to our distributing agencies in the United States, namely, Rotaprint Machines, Inc., New York, and American Rotaprint Corporation, Cleveland, Ohio, without electric motor, but with ink rollers, at 3,900 reichsmarks f. o. b. factory, not including cost of packing and inland freight to port of shipment; that the cost of packing the R–30 for shipment to the United States was 102.02 reichsmarks, and the inland freight from factory to port of shipment was 31.50 reichsmarks; that since March 20, 1939, the Rkl. machine has been freely offered and sold to said distributing agencies throughout the United States without electric motor but with automatic water and ink fountain at 1,021.25 reichsmarks f. o. b. factory not including cost of packing and inland freight to port of shipment; that the cost of packing the Rkl. machines for shipment to the United States was 48 reichsmarks, and the inland freight from factory to the port of shipment was 11 reichsmarks; that the usual wholesale quantity of each of the machines sold for home consumption in Germany both to dealers and consumers was one machine; that the usual wholesale quantity for each of the said machines for export to the United States was two machines; and that both of said machines since January 1, 1938, have been freely offered to all purchasers in countries other than the United States, except Great Britain, at prices not less than those at which such machines have been sold to the German manufacturer's distributing agencies in the United States.

The witness, Floer, being recalled by counsel for the plaintiff, testified in part as follows:

R. Q. On this invoice No. 2572, dated December 8, 1939, covering the sale of one Rkl. machine No. 7160, as shown, to American Rotaprint Corporation for $635.00, did that cover the machine exactly as it was imported? * * *

* * * * * * *

A. Yes, sir; it had never been taken out of the case.

R. Q. Didn't have the motor or anything attached to it by your concern?— A. No.

R. Q. And $635.00 represents the price you charged to American Rotaprint Corporation?—A. Yes, sir.

R. Q. And did that include your profit?—A. Yes, sir.

R. Q. Could you state what that profit was?—A. About $100.00.

R. Q. And did that price include your overhead expenses?—A. Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

R. Q. What did you find your general expenses for the year 1939 to be, approximately?—A. I couldn't say that without looking at my books.

R. Q. Would it exceed or be less than 8 per cent?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

A. It certainly would exceed 8 per cent, materially.

At the close of the testimony, the Government offered in evidence a report of customs agent A. P. Giessler, which, with annexed papers, was admitted in evidence as defendant's collective exhibit 5. The Government also offered in evidence the report of Paul Hermes,. Treasury representative, which, on objection by counsel for the plaintiff on the ground that the attendance of said Treasury representative could reasonably be had, was marked defendant's exhibit 6 for identification.

Inasmuch as in my opinion the provision in section 501 of the Tariff Act of 1930 to the effect that affidavits of persons whose attendance cannot reasonably be had does not apply to reports of customs agents, the report in question is now admitted in evidence as. defendant's collective exhibit 6 for what it is worth.

Upon this record I find the following facts:

1. That no machines identical with or similar to those here imported were sold, at the time of the exportation of the machines at bar, for home consumption in Germany, the country of exportation; and that all sales of Rotaprint machines for home consumption in Germany were subject to restrictions as to resale.

2. That at the time of the exportation of the machines at bar, such or similar machines thereto were sold by the foreign manufacturer for export to the United States, but only to two American purchasers, viz, American Rotaprint Corporation of Cleveland, Ohio, and Rotaprint. Machines, Inc. of New York, N. Y., the importer herein.

3. That at the time of the exportation of the machines at bar, the importer herein had no exclusive territorial contract with the foreign manufacturer, although subsequently, namely, from June 1, 1939, it did have such an exclusive territorial agency.

4. That previous to and subsequent to the date of exportation of the machines at bar, such or similar machines were sold and offered for sale to only two purchasers in the United States, namely, the importer herein, and the American Rotaprint Corporation of Cleveland, Ohio.

5. That previous to the year 1939, the said American Rotaprint Corporation of Cleveland, Ohio, enjoyed an exclusive agency in the. United States for the sale of such or similar machines to those here imported.

6. That at no time were such or similar machines to those here imported sold to any other purchasers in the United States than to the said importer and the American Rotaprint Corporation of Cleveland, Ohio.

7. That the record shows that only one Rkl. machine was sold in the United States in its imported condition, such sale having been made 9 months after the exportation of the Rkl. machines here in question.

On the above facts I hold—

1. That at the time of exportation of the machines in question there existed no foreign value therefor. *J. H. Cottman & Co.* v. *United States*, 20 C. C. P. A. 344, T. D. 46114; *United States* v. *F. B. Vandegrift & Co.*, 26 C. C. P. A. 360, C. A. D. 42; *United States* v. *Half Moon Mfg. & Trading Co., Inc.*, 28 C. C. P. A. 1, C. A. D. 115.

2. That at the time of the exportation of said machines there existed therefor no export value.

In my opinion the case of *United States* v. *Malhame & Co.*, 24 C. C. P. A. 448, T. D. 48911, is here controlling. There, as here, the foreign manufacturer sold for export to the United States to two purchasers only, namely to his own distributing agent, and to one other firm. The merchandise consisted of certain prayer books. In holding that such a state of facts would not constitute export value within the meaning of section 402 (d) of the Tariff Act of 1930, the appellate court said:

* * *. The books, in order to have an export value, must have been freely offered to all purchasers in the principal markets of Belgium in the ordinary course of trade at the time of the exportation to the United States of the books here involved. Neither do we think that, where three manufacturers restrict their sales to certain individuals or firms, it can be claimed that such is the ordinary course of trade in the principal markets of Belgium.

It therefore appears from the evidence that there was no free offering of such or similar books as those here involved to all purchasers in the principal markets of Belgium for export to the United States. * * *.

In the instant case, although the statement is made in behalf of the foreign manufacturer that such or similar machines were freely offered for sale in Germany for export to the United States, the fact remains that no actual offers for sale or sales of such or similar merchandise were ever made to any purchaser in the United States except the importer herein and the American Rotaprint Corporation of Cleveland, Ohio, the latter having previously had an exclusive agency for the sale of such machines covering the entire United States, and the importer herein, after the exportation of the machines at bar, having obtained an exclusive agency for the sale of such merchandise in New York, New Jersey, Pennsylvania, and New England.

3. That at the time of exportation of said merchandise there existed therefor no United States value. *Draeger Shipping Co.* v. *United States*, Reap. Dec. 4870, affirmed by the appellate division in Reap.

Dec. 5118, and by the United States Court of Customs and Patent Appeals in Suit 4354, decided March 23, 1942; *United States* v. *G. W. Sheldon & Co.*, 23 C. C. P. A. 245, T. D. 43108; *Stern Hat Co.* v. *United States*, 26 C. C. P. A. 410, C. A. D. 48; *United States* v. *Collin & Gissel*, 29 C. C. P. A. 96, C. A. D. 176.

Under all the circumstances, although the plaintiff herein has sustained the burden of proving error on the part of the appraiser in finding a foreign value for said merchandise, nevertheless, having failed to sustain the burden resting upon it to prove some other value for said merchandise, the instant appeals must be and they hereby are dismissed. Judgment will be rendered accordingly.